# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | NO. 3:18-cr-00192 |
| v. ) | |
| ) | JUDGE CAMPBELL |
| HERBERT MARSH ) | |

## MEMORANDUM AND ORDER

### I.  INTRODUCTION

Pending before the Court is Defendant's Motion to Suppress (Doc. No. 96) and Amended Motion to Suppress (Doc. No. 158). The Government filed responses to the motions. (Doc. Nos. 103, 165). The Court held a hearing on the Motion on February 6, 2020. After the hearing, the Court received two *pro se* letters from Defendant. (Doc. Nos. 173, 174).

### II.  FACTS[1]

On June 27, 2018, Metro Nashville Police Officers Anthony Cavis and Kevin Reynolds were patrolling the North Nashville neighborhood as part of the "Flex Team," a proactive policing unit. While completing an unrelated car stop, the officers observed a gray BMW matching the description of a car associated with the shooting of two juveniles the previous day—a gray mid-2000s BMW with four to five male occupants. Officer Cavis testified that he believed he could stop the car for investigative purposes based on the description of the car and the occupants, but he wanted to "look for a traffic stop" to reassure himself that the stop was permissible. The officers followed the BMW in a marked patrol car for about five minutes. The car took a circuitous route from the intersection of D.B. Todd Boulevard and Clay Avenue to Rosa Parks Boulevard. The

---

[1] The following facts are primarily drawn from the testimony and evidence presented during the hearing held on February 6, 2020.

driver of the BMW, James Horton, testified that he was aware the patrol car was following them.

When the BMW reached the intersection at Rosa Parks Boulevard, it entered the left turn lane, engaged the turn signal, and executed a left turn onto Rosa Parks, which has two lanes of travel in each direction. It is undisputed that the BMW turned into the far-right lane, not the lane closest to the median.[2] Officers Cavis and Reynolds were immediately behind the BMW in the left turn lane and observed the BMW turn into the far-right lane. The officers signaled for the BMW to pull over. The officers testified that they believed the law required the driver to maintain his lane and turn to the lane of traffic closest to the center line when executing a left turn.

Officers Cavis and Reynolds pulled up directly behind the car. An unmarked car, which was also in the area, pulled in behind the marked car.[3] The officers approached the car—Officer Cavis on the driver's side and Officer Reynolds on the passenger side. The driver, James Horton, testified that Officer Cavis told him the reason for the stop was an improper left turn and that the matched the description of a car involved in a shooting. Both officers testified they could smell the odor of marijuana emitting from the car. The driver, James Horton, could not provide a license and registration, but gave Officer Reynolds his name and social security number. Horton either told the officer at that time that his license was "no good" or the officers discovered the license was suspended when they ran his information through the database. Officer Reynolds observed that the front-seat passenger had been shot in the leg. Because of the odor of marijuana in the

---

[2] Officers Cavis and Reynolds testified at the hearing that the vehicle turned into the far-right lane. Co-defendant James Horton, who was driving the car, agreed.

[3] The exact location of the second car and timing of its arrival at the stop was the subject of some dispute at the hearing. The officers all testified that the unmarked car was close behind the marked car, but that the officers in the unmarked car remained in their car until assistance was requested. The officers credibly explained that the police log times may not correspond precisely with their locations but are contingent on the officers notifying dispatch and the information being timely and accurately recorded. The Court did not find anything suspect about the discrepancies between the dispatch logs and the officer testimony.

vehicle, the officers obtained personal information from all of the occupants and returned briefly to the patrol car to run their information through the database and determine their next steps. At this point the officers spoke with Officer Khalid Abbady, who was driving the unmarked car, and apprised him of the situation: the driver had no license, the car smelled of marijuana, and one of the passengers had a bandaged gunshot wound.

Officer Cavis asked the driver, James Horton, to step outside of the car for some additional questions. Officer Reynolds testified that Horton told him "we just smoked" to explain the odor of marijuana and said there would be a joint in the ashtray. Horton's testimony varied slightly— he and another passenger had smoked earlier that day, but had not smoked in the car. Horton testified he had rolled a joint with some particularly strong-smelling marijuana in the car that day and the strong-smelling joint was in the car but had not been smoked.

Following the conversation with Horton, the officers removed the passengers from the car and proceeded to search the car for marijuana. It is undisputed that no one consented to the search. During the search, the officers found a small amount of marijuana in a sandwich bag, a handheld digital camera with case, and a marijuana joint in the passenger area of the car, and three handguns in a backpack in the unlocked trunk of the car. The officers observed a pool of blood and blood spatter in the backseat and on the floorboard. After completing the search of the car, the officers returned to the car glovebox, which was either locked or jammed and would not open readily. Officer Abbady pried it open with a knife and found two handguns.[4] A photo from the scene shows the open glovebox with some kind of rag or towel draped over the edge concealing the

---

[4] Defendant offered the testimony of an independent investigator, David Barela, who said that the lock was broken when he examined it. Mr. Barela did not say when exactly he examined the lock, except that it was sometime after the glovebox was pried open by police. Mr. Barela speculated that the lock was broken by too much pressure placed on the latch, but admitted that he had no way to know whether the lock was broken before the search.

locking mechanism. (Def. Ex. 6). The officers testified that the did not believe they damaged the glovebox by prying it open. None of the police reports mention that the glovebox had to be pried open.

## III.   ANALYSIS

Defendant argues all of the evidence seized during the search of the automobile should be suppressed because the police did not have probable cause to stop or search the car, the stop was unnecessarily prolonged, and the officers improperly opened the locked glovebox. The Government responds that the stop was legal because the officers had a reasonable belief that the driver had committed a traffic infraction and the officers had independent basis to conduct an investigatory stop based on the description of the car and the occupants matching that from a shooting the previous day. After stopping the car, the Government argues the officers had probable cause to search the vehicle for marijuana based on the odor of marijuana and Horton's statements. The Government contends that the probable cause extends to the contents of the vehicle, including locked containers, and that the search of the locked glovebox was, therefore, proper.

**A. The Vehicle Stop was Supported by Probable Cause**

Vehicle stops are "seizures" that must be conducted in accordance with the Fourth Amendment. *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (citing *Brendlin v. California*, 551 U.S. 249, 255-59 (2007)). To stop a vehicle for a suspected traffic violation, "officers need only 'reasonable suspicion' — that is 'a particularized and objective basis for suspecting the particular person stopped' of breaking the law." *Id*. (citing *Prado Navarette v. California*, 572 U.S. 393, 396 (2014)); *see also Whren v. United States*, 517 U.S. 806, 810 (1996) ("the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred"). If the alleged traffic violation is completed, rather than ongoing, officers must

have probable cause to conduct a stop. *United States v. Simpson*, 520 F.3d 531, 540 (6th Cir. 2008). An officer's reasonable, but mistaken belief that the conduct in question is illegal, is sufficient probable cause for a stop. *Heien*, 574 U.S. at 62-63 (reviewing precedent). In *Heien*, an officer, mistakenly believing that two working brake lights were required, stopped a car with only one working light. *Id*. at 67. After reviewing the statute, the court concluded that the officer's mistaken belief that two brake lights were required was objectively reasonable and concluded, "because the mistake of law was objectively reasonable, there was reasonable suspicion justifying the stop." *Id*. at 68.

Officer Cavis testified that he believed that when turning left, a driver is required to maintain the lane of travel and enter the lane closest to the center line. The corresponding traffic regulations leave some room for interpretation.

> (2) LEFT TURNS ON TWO-WAY ROADWAYS. At any intersection where traffic is permitted to move in both directions on each roadway entering the intersection, an approach for a left turn shall be made in that portion of the right half of the roadway **nearest the center line thereof** and by **passing to the right of the center line** where it enters the intersection, and after entering the intersection the left turn shall be made so as to leave the intersection **to the right of the center line** of the roadway being entered. Whenever practicable, the left turn shall be made in that portion of the intersection to the left of the center of the intersection[.]

Tenn. Code Ann. § 55-8-140 (emphasis added). The Tennessee Comprehensive Driver License Manual (the "Manual"), published by the Tennessee Department of Safety, advises, "Leave from the left lane or as close to the yellow center line as possible and enter in the left lane or as close to the yellow center line as shown in diagram []." Manual at 57.[5] The Manual continues, "Drive just to the right of the center line of the street you're entering and be sure to turn into the first lane past the center line. This avoids conflict with other traffic making either right or left turns. Never turn

---

[5] Available at www.tn.gov/content/dam/tn/safety/documents/DL_Manual.pdf

'wide' into the right lane. The right lane will be used by any oncoming vehicles turning right." *Id*. at 58.

During the hearing both the Defendant and the Government parsed the statutory language, referring to an aerial photo of the intersection. (*See* Def. Ex. 3). While it appears the parties ultimately agree that the car was not required to turn into the lane nearest the center line if it was safe to turn into another lane, the Court finds the Officer's understanding of the law was not unreasonable. Because the Officers stopped the car based on an objectively reasonable belief that a traffic violation had occurred, the stop was not in violation of the Fourth Amendment.[6]

**B. The Vehicle Search Was Supported By Probable Cause**

"Although searches must normally be conducted pursuant to a warrant, under the well-known automobile exception, a warrantless search of a vehicle that has been stopped lawfully is permissible if the search is based upon probable cause." *United States v. Crumb*, 287 F. App'x 511, 513 (6th Cir. 2008) (citing *United States v. Ross,* 456 U.S. 798, 823 (1982)). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion, and is found to exist when there is a fair probability that evidence of a crime will be located on the premises of the proposed search." *Id*. (quoting *United States v. Jackson,* 470 F.3d 299, 306 (6th Cir. 2006)). The Sixth Circuit has held that the odor of marijuana, "by itself, is sufficient to provide probable cause to search the interior of [a vehicle.]" *Id*. (citing *United States v. Garza*, 10 F.3d 1241, 1243-44 (6th Cir. 1993); *see also*, *Carter v. Parris*, 910 F.3d 835, 840 (6th Cir. 2018) (the odor of marijuana alone is sufficient for probable cause) (citing *United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002)).

---

[6] The officers may also have had cause to conduct an investigatory stop of the vehicle based on the description of a vehicle and occupants suspected of a shooting. Given the finding of reasonableness above, and because neither party briefed this potential alternative justification for the stop, the Court does not reach this question.

Here, the officers testified they smelled the odor of marijuana coming from the vehicle. The officers' testimony is supported by the testimony of the driver, James Horton. Horton testified: (1) he smoked marijuana earlier that day; (2) another passenger in the car had also smoked marijuana before getting in the car; (3) he could smell marijuana on her "a little" when she got in the car; and (4) he rolled a joint with a particularly strong smelling marijuana while in the car and placed it in a case in the car. The search of the car produced a small baggie of marijuana and an unsmoked joint.

The Court finds the Officers' testimony regarding the odor of marijuana to be credible and supported by other facts and testimony. The odor of marijuana provided reasonable cause to search the vehicle for marijuana.

**C. The Search of the Locked Glovebox Was Reasonable**

The scope of a warrantless search based on probable cause is "no narrower – and no broader – than the scope of a search authorized by a warrant supported by probable cause." *United States v. Ross*, 456 U.S. 798, 823 (1982). "The scope of a warrantless search of an automobile thus is not defined by the nature of the container in which the contraband is secreted. Rather, it is defined by the object of the search and the places in which there is probable cause to belief that it may be found." *Id*. "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id*. at 825. The Sixth Circuit, has addressed the search of locked containers in cars. *See Carter*, 910 F.3d at 840. In *Carter*, the court denied a motion for ineffective assistance of counsel for failure to object to a search on the grounds that that search complained of—search of a locked container inside a car—is permissible when probable cause justifies the search of an automobile and the object of the search could reasonably be found within the locked container. *Carter*, 910 F.3d at

840 ("the fact that the lockbox was a locked container inside the car also makes no difference").

Defendant does not dispute that the object of the search, marijuana, could reasonably be concealed within the glovebox, but argues that it was unreasonable for the Officers to forcibly open the locked glovebox.[7] This contention is unsupported by any caselaw. The Sixth Circuit has affirmed that when executing a probable cause search pursuant to a warrant, occasionally property must be damaged in order to fully execute the search. *See United States v. Church*, 823 F.3d 351, 357 (6th Cir. 2016). In *Church*, the court found the police acted reasonably when they pried open a safe when executing a search pursuant to a warrant. *Id*. The court noted that the officers had probable cause to believe there might be drugs inside the safe and the owner had refused to provide the combination. *Id*.

Here, the Officers were executing a search for marijuana based on probable cause and the owner or occupants of the car refused to provide means of opening the glovebox. That the search was warrantless does not alter the analysis. Once probable cause for the search of an automobile is established, the scope is the same as if the Officers were acting pursuant to a warrant. *See Ross*, 456 U.S. at 823. Accordingly, the Court finds that the Officers did not act unreasonably when they pried open the glovebox.

## D. The Stop Was Not Unreasonably Prolonged

Defendant argues that officers unreasonably prolonged the stop by asking questions unrelated to the alleged traffic violation. The Court disagrees. In assessing whether a period of detention for investigation was too long, courts "examine whether the police diligently pursued a

---

[7] The is a dispute of fact regarding whether the glovebox was locked or merely jammed when the officers tried to open it and whether the forcible opening of the glovebox caused damage to the lock or the lock was damaged before it was pried open. Resolution of these questions is not relevant to the Court's analysis.

means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 676 (1985). The entire stop took approximately one hour and involved several police units and the ATF, a search of the car, and an inventory of contraband discovered during the search. The officers testified that from the time of the stop until they began the search of the vehicle was no more than 10-15 minutes. During this time, they asked some preliminary questions of the driver and front-seat passenger (who had a gunshot wound) and conducted electronic records checks of everyone in the car. There is no evidence that the officers did not diligently pursue the investigation or evidence from which the Court can conclude that the detention was unnecessarily lengthy.

## IV.  CONCLUSION

For the reasons stated, the Defendant's Motion to Suppress (Doc. No. 96) and Amended Motion to Suppress (Doc. No. 158) are **DENIED**.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE